No. 22-3765

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

—————————

KEVIN D. HARDWICK,

*Plaintiff-Appellee,*

v.

3M COMPANY; E.I. DU PONT DE NEMOURS AND COMPANY,
THE CHEMOURS COMPANY; ARCHROMA MANAGEMENT, LLC; ARKEMA,
INC.; ARKEMA FRANCE, S.A.; AGC CHEMICALS AMERICAS, INC.;
DAIKIN INDUSTRIES, LTD.; DAIKIN AMERICA, INC.;
SOLVAY SPECIALTY POLYMERS, USA, LLC,

*Defendants-Appellants.*

—————————

On Appeal from the United States District Court for the Southern
District of Ohio, No. 2:18-cv-01185, Chief Judge Edmund A. Sargus

—————————

# BRIEF FOR THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, THE AMERICAN TORT REFORM ASSOCIATION, THE NATIONAL ASSOCIATION OF MANUFACTURERS, AND THE AMERICAN CHEMISTRY COUNCIL AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS

—————————

Andrew R. Varcoe
Jennifer B. Dickey
U.S. CHAMBER
LITIGATION CENTER
1615 H Street NW
Washington, DC 20062

*Counsel for the Chamber of
Commerce of the United
States of America*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for the Chamber of
Commerce of the United States of
America, American Tort Reform
Association, and National
Association of Manufacturers*

December 27, 2022        *(Additional counsel listed in inside cover)*

H. Sherman Joyce
Lauren Sheets Jarrell
AMERICAN TORT
REFORM ASSOCIATION
1101 Connecticut Avenue NW
Suite 400
Washington, DC 20036

*Counsel for American
Tort Reform Association*

Erica Klenicki
Michael A. Tilghman II
NAM LEGAL CENTER
733 Tenth Street NW
Suite 700
Washington, DC 20001

*Counsel for National
Association of Manufacturers*

Aleacia Chinkhota
AMERICAN
CHEMISTRY COUNCIL
700 Second Street NE
Suite 700
Washington, DC 20002

*Counsel for
American Chemistry Council*

Val Leppert
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309

Barrett Anderson
KING & SPALDING LLP
1100 Louisiana Street
Houston, TX 77002

*Counsel for the Chamber of
Commerce of the United States of
America, American Tort Reform
Association, and National
Association of Manufacturers*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

*Amici* make the following disclosures under Sixth Circuit Rule 26.1:

**1. Is any *amicus* a subsidiary or affiliate of a publicly owned corporation?**

No. The Chamber of Commerce of the United States of America, the American Tort Reform Association, and the National Association of Manufacturers are nonprofit corporations organized under the laws of the District of Columbia. The American Chemistry Council is a nonprofit corporation organized under the laws of the state of New York. None of the *amici* has a parent company and none has issued stock.

**2. Is there a publicly owned corporation, not a party to the appeal or an *amicus*, that has a financial interest in the outcome?**

None known.

*/s/ Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ...............................i

TABLE OF AUTHORITIES................................................. iii

INTEREST OF *AMICI CURIAE* ..............................................1

INTRODUCTION ........................................................3

ARGUMENT ............................................................6

I.  The "appropriate" "injunctive relief" available under Rule 23(b)(2) is limited to the relief historically available in equity .............................................................6

    A.  Federal courts' equitable power is limited by traditional equitable practice at the time of the Founding unless Congress clearly provides otherwise ...................................................8

    B.  Rule 23(b)(2) incorporates traditional equity constraints ...............................................10

II.  The relief sought by Hardwick does not comport with traditional equitable principles and has no historical analogue........................................................15

    A.  Hardwick's remedies violate core principles governing equity at the time of the Founding .....................17

    B.  Hardwick's remedies have no historical analogue ...............22

CONCLUSION .........................................................28

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*Am. Malting Co. v. Keitel,*
209 F. 351 (2d Cir. 1913) ........................................................ 23

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ............................................................... 10

*AMG Cap. Mgmt., LLC v. FTC,*
141 S. Ct. 1341 (2021) ........................................................... 12

*Atlas Life Ins. Co. v. W.I.S., Inc.,*
306 U.S. 563 (1939) ................................................................. 9

*Bonaparte v. Camden & A.R. Co.,*
3 F. Cas. 821 (D.N.J. 1830) .............................................. 17, 24

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ............................................................... 18

*Boyle v. Zacharie,*
31 U.S. 648 (1832) .............................................................. 8, 15

*Communist Party of Ind. v. Whitcomb,*
409 U.S. 1235 (1972) ............................................................. 19

*Dairy Queen, Inc. v. Wood,*
369 U.S. 469 (1962) .......................................................... 15, 18

*De Beers Consol. Mines v. United States,*
325 U.S. 212 (1945) .......................................................... 12, 15

*Dering v. Earl of Winchelsea,*
29 Eng. Rep. 1184 (Ch. 1787) .............................................. 19

*Di Giovanni v. Camden Fire Ins. Ass'n,*
296 U.S. 64 (1935) ................................................................. 17

*Great-West Life & Annuity Co. v. Knudson,*
534 U.S. 204 (2002) .......................................................... 12, 18

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ................................................................. *passim*

*Hardwick v. 3M Co.*,
   589 F. Supp. 3d 832 (S.D. Ohio 2022) ................................................... 4

*In re E.I. Dupont de Nemours*
*& Co. C-8 Pers. Injury Litig.* (*In re 3M Co.*),
   No. 22-305, 2022 WL 4149090 (6th Cir. Sept. 9, 2022) ............. *passim*

*In re Japanese Elec. Prods. Antitrust Litig.*,
   631 F.2d 1069 (3d Cir. 1980) ............................................................. 26

*In re Sawyer*,
   124 U.S. 200 (1888) ........................................................................... 19

*Jackson v. Petrie*,
   32 Eng. Rep. 807 (1804) ..................................................................... 20

*Lane v. Newdigate*,
   32 Eng. Rep. 818 (Ch. 1804) ............................................................. 20

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ........................................................................... 12

*Olden v. LaFarge Corp.*,
   383 F.3d 495 (6th Cir. 2004) .............................................................. 20

*Osborn v. Bank of United States*,
   22 U.S. 738, 747 (1824) ..................................................................... 24

*Ripon v. Hobart*,
   40 Eng. Rep. 65 (Ch. 1834) ............................................................... 19

*Robinson v. Craig*,
   16 Ala. 50 (1849) ............................................................................... 26

*Russell v. Southard*,
   53 U.S. 139, 144 (1851) ..................................................................... 15

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ........................................................................... 11

*Taggart v. Lorenzen,*
    139 S. Ct. 1795 (2019) ........................................................ 12

*United States v. Bitter Root Dev. Co.,*
    200 U.S. 451(1906) ................................................. 15, 17, 27

*United States v. Microsoft Corp.,*
    147 F.3d 935 (D.C. Cir. 1998) .............................................. 9

*United States v. Szoka,*
    260 F.3d 516 (6th Cir. 2001) .............................................. 13

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ......................................... 6, 10, 14, 21

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ....................................................... 9

*Zinser v. Accufix Rsch. Inst., Inc.,*
    253 F.3d 1180 (9th Cir. 2001) ............................................ 20

## Statutes & Rules

11 U.S.C. § 524 .................................................................. 12

15 U.S.C. § 53 .................................................................. 12

28 U.S.C. § 2072 ................................................................ 11

47 U.S.C. § 401 ................................................................. 13

1 Stat. 73 ....................................................................... 8

1 Stat. 275 ...................................................................... 8

Fed. R. Civ. P. 23 ......................................................... *passim*

## Other Authorities

Barron, Rupert F.
    Annotation, *Existence and Nature of Cause of Action for
    Equitable Bill of Discovery*, 37 A.L.R. 5th 645 (1996) ......................... 25

Beach, Charles Fisk, Jr.
    I Modern Equity: Commentaries
    on the Law of Injunctions (1895)...........................................19

EPA,
    No. EPA-100-K-21-002, PFAS Strategic Roadmap:
    EPA's Commitments to Action 2021–2024 (2021).............................22

*EPA's Actions to Address PFAS*,
    EPA.gov (2022),
    https://www.epa.gov/pfas/epa-actions-address-pfas ..........................22

Fed. R. Civ. P. 23(b)(2)
    Advisory Comm.'s Note to 1966 Amendment ....................................14

Hilliard, Francis
    The Law of Injunctions (2d ed. 1869)...........................................18, 19

La G., R.E.
    Annotation,
    *Accounting in Equity in Case of Tort*, 53 A.L.R. 815 (1928) ..............27

1 Pomeroy, John Norton
    A Treatise on Equity Jurisprudence (4th ed. 1918) ...................*passim*

2 Pomeroy, John Norton
    A Treatise on Equity Jurisprudence (4th ed. 1918) ..........................24

4 Pomeroy, John Norton
    A Treatise on Equity Jurisprudence (4th ed. 1918) .....................23, 24

1 Story, Joseph
    Commentaries on Equity Jurisprudence
    (Alfred Edward Randall ed., 3d ed. 1920)................................3, 23, 26

11A Wright, C., A. Miller, & M. Kane
    Federal Practice and Procedure (2d ed. 1995)...................................10

## INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.

The American Tort Reform Association (ATRA) is a broad-based coalition of businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote reform of the civil justice system with the goal of ensuring fairness, balance, and predictability in civil litigation.

The National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs over 12.9 million men and women, contributes $2.77 trillion to the U.S. economy annually, has the largest economic

---

[1] No counsel for a party authored this brief in whole or in part, and no entity or person, other than amici, their members, or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

impact of any major sector, and accounts for nearly two-thirds of all private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The American Chemistry Council (ACC) represents the leading companies engaged in the multibillion-dollar business of chemistry. ACC members apply the science of chemistry to make innovative products, technologies, and services that make people's lives better, healthier, and safer. ACC is committed to improved environmental, health, safety, and security performance through Responsible Care®; common sense advocacy addressing major public policy issues; and health and environmental research and product testing. ACC members and chemistry companies are among the largest investors in research and development and are advancing products, processes, and technologies to address climate change, enhance air and water quality, and progress toward a more sustainable, circular economy.

The Chamber, ATRA, NAM, and ACC regularly file *amicus* briefs in cases that present issues important to their members.  This case is of

interest to *amici* because thousands of businesses across the country, including members of *amici*, are or may become defendants in putative class actions. *Amici* share a vital interest, on behalf of their members and the broader business community, in promoting a predictable, rational, and fair legal environment for these actions. *Amici* thus have a keen interest in ensuring that the courts rigorously and consistently analyze whether plaintiffs have properly satisfied all the requirements of Federal Rule of Civil Procedure 23 before certifying a class.

## INTRODUCTION

As Justice Story once cautioned, equity courts with "unbounded jurisdiction" would be "formidable instruments of arbitrary power" that "would rise above all law ... and be a most arbitrary legislator in every particular case." 1 Joseph Story, Commentaries on Equity Jurisprudence § 19 (Alfred Edward Randall ed., 3d ed. 1920) (quotation marks omitted). Justice Story's concern about unconstrained equity powers has become a reality in this case. The district court concluded that the "injunctive relief" available under Federal Rule of Civil Procedure 23(b)(2) includes forcing Defendants to pay medical monitoring costs for a class larger than the population of most countries and to fund a "science panel" to study

the impact of PFAS exposures, all *before* there has been any judicial determination that Defendants have actually harmed any class member through PFAS exposures. *Hardwick v. 3M Co.,* 589 F. Supp. 3d 832, 867–69 (S.D. Ohio 2022). This novel, multi-billion-dollar remedy is the type of "'nuclear weapon' of the law" that the Supreme Court has prohibited federal courts from deploying in the name of equity. *See Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999).

The district court's order is erroneous for multiple reasons. As aptly noted by the motions panel, the district court "certifie[d] one of the largest class actions in history, predicated on a questionable theory of standing and a refusal to apply a cohesion requirement endorsed by seven courts of appeals, to authorize pursuit of an ill-defined remedy that sits uneasily with traditional constraints on the equity power and threatens massive liability." *In re E.I. Dupont de Nemours & Co. C-8 Pers. Injury Litig.* (*In re 3M Co.*), No. 22-305, 2022 WL 4149090, at *10 (6th Cir. Sept. 9, 2022). The motions panel further explained that the district court certified a Rule 23(b)(2) class for a "claim [that] is probably more analogous to a damages action than to traditional equitable relief." *Id.* at *5 n.3.

While *amici* endorse Defendants' other challenges to the district court's order as well, this brief focuses on the court's contravention of the "traditional constraints on the equity power." *Id.* The motions panel's observation was correct; indeed, the district court's approach does not merely "sit[] uneasily" with traditional constraints on the equity power—it obliterates those constraints. *Id.*

Part I of this brief explains that any injunctive relief under Rule 23(b)(2) is necessarily subject to the constraints that stem from traditional equity practice because Rule 23(b)(2) neither displaces those constraints nor empowers courts to craft new remedies in the name of equity. Part II explains that the district court's order fails the two prongs that courts consider when determining whether a remedy conforms with traditional equity practice. The court's remedy both lacks support in traditional equitable principles and lacks any historical analogue in the injunctions ordered by equity courts at the Founding. Rule 23(b)(2) is for claims that genuinely seek a traditional injunction and is not a back door for damages claims to elude the limits and protections that apply under Rule 23(b)(3).

5

# ARGUMENT

## I. The "appropriate" "injunctive relief" available under Rule 23(b)(2) is limited to the relief historically available in equity.

Rule 23(b), entitled "Types of Class Actions," distinguishes between actions seeking injunctive relief—which are governed by Rule 23(b)(2)—and actions seeking damages or other monetary relief—which are governed by Rule 23(b)(3). Hardwick sought, and the district court granted, certification under Rule 23(b)(2), which permits class actions where, among other things, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final *injunctive relief* or corresponding declaratory relief is *appropriate* respecting the class as a whole." Fed. R. Civ. P. 23(b)(2) (emphasis added).

The certification order should be reversed for the fundamental reason that Hardwick's action does not seek "appropriate" "injunctive relief" that could be cognizable under Rule 23(b)(2). Claims for monetary relief that is not merely "incidental to" genuine injunctive or declaratory relief are prohibited; indeed, "monetary claims" may not be permissible "*at all*" under Rule 23(b)(2). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (emphasis added). Despite this, Hardwick seeks to use Rule

23(b)(2) to force Defendants to pay huge sums of money to fund medical monitoring and a "science panel" to study the putative class's theory of injury. In other words, the remedy that he seeks would force Defendants to pay money to help the class find out whether they have a viable claim against Defendants.

As explained in part A below, the Supreme Court has held that federal courts' equitable authority is presumptively limited to the remedies traditionally available in equity at the time of the Founding and is subject to the traditional constraints that limited courts' equitable authority at that time. The exception to that rule is where Congress has clearly conferred broader or additional authority in a particular statute.

As explained in part B, Congress has not done so here. The Rules Enabling Act did not authorize the Supreme Court to expand upon or depart from traditional equitable constraints in promulgating Rule 23(b)(2), and the rule does not purport to do so. To the contrary, its reference to "appropriate" "injunctive relief" incorporates those traditional limits. As a result, the district court's authority in this case was limited to considering traditional equitable remedies and did not

extend to monetary or other individualized remedies falling outside the traditional bounds of equity.

**A.  Federal courts' equitable power is limited by traditional equitable practice at the time of the Founding unless Congress clearly provides otherwise.**

In 1789, in the first Judiciary Act, Congress gave the federal courts jurisdiction over "all suits ... in equity." 1 Stat. 73, 78, ch. 20, § 11. Three years later, in the 1792 Judiciary Act, Congress directed that "the forms of writs, executions and other processes ... shall be the same as are now used in ... courts of equity ... except so far as may have been provided for by" acts of Congress or "regulations as the supreme court of the United States shall think proper from time to time by rule to prescribe." 1 Stat. 275, 276, ch. 35 § 2. Early on, the Supreme Court interpreted these statutes as "provid[ing] that the modes of proceeding in equity suits shall be ... according to the practice of courts of equity in the parent country ... subject, of course, to the provisions of the acts of congress." *Boyle v. Zacharie*, 31 U.S. 648, 658 (1832).

Over the centuries, the Court has repeatedly reaffirmed this principle. As the Court put it in 1939, "[t]he 'jurisdiction' thus conferred ... is an authority to administer in equity suits the principles of the

system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Atlas Life Ins. Co. v. W.I.S., Inc.*, 306 U.S. 563, 568 (1939). More recently, the Court quoted this passage from *Atlas Life* with approval and admonished that, in federal court, the "flexibility" sometimes associated with equity "is confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano*, 527 U.S. at 322.

Because this historical baseline is so firmly established, Congress is presumed to incorporate it into its laws. While Congress may have the power to depart from traditional equity constraints, such a departure is "'not lightly assume[d]'" but rather "requires a 'clear and valid legislative command.'" *United States v. Microsoft Corp.*, 147 F.3d 935, 943–44 (D.C. Cir. 1998) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982)); *see Grupo Mexicano*, 527 U.S. at 329 (Supreme Court's "traditionally cautious approach to equitable powers ... leaves any substantial expansion of past practice to Congress").

The Supreme Court has squarely applied this rule to Federal Rule of Civil Procedure 65, which governs injunctive relief. In *Grupo Mexicano*,

9

the Court explained that "[t]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by [Rule 65] and depend on traditional principles of equity jurisdiction." 527 U.S. at 318–19 (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2941, p.31 (2d ed. 1995)). The ultimate question in that case, therefore, was "whether the relief respondents requested here was traditionally accorded by courts of equity." *Id.* at 319.

The same inquiry applies in the present case. Like Rule 65, Rule 23(b)(2) incorporates rather than departs from traditional equity practice.

## B. Rule 23(b)(2) incorporates traditional equity constraints.

The Supreme Court has recognized that traditional equity practice constrains federal courts under Rule 23. In *Wal-Mart Stores, Inc. v. Dukes*, the Court explained that "Rule 23 'stems from equity practice' that predated its codification" and that "in determining its meaning we have previously looked to the historical models on which the Rule was based." 564 U.S. at 360 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997)).

10

That makes sense, as the Rules Enabling Act did not authorize the Supreme Court to expand the equitable powers of the federal courts. If anything, the Rules Enabling Act is a clear congressional command *prohibiting* the Supreme Court from doing so: the Act limits the Court to promulgating only "general rules of practice and procedure" and requires that these rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(a)–(b). This statutory language permits the Court to promulgate a rule "so long as it regulates only the process for enforcing those rights, and not the rights themselves, *the available remedies*, or the rules of decision for adjudicating either." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 394 (2010) (emphasis added).

Even if the Rules Enabling Act could somehow be read as authorizing the Supreme Court to expand the Judiciary's equitable jurisdiction beyond traditional equity practice, nothing in Rule 23(b)(2) suggests that the Court believed that it was doing so. To the contrary, the rule merely refers to "injunctive relief," and the Court has interpreted almost identical language as insufficient to show a "departure from past practice." *Grupo Mexicano*, 527 U.S. at 322.

For example, in addition to the closely on-point decision regarding Rule 65 in *Grupo Mexicano*, the Court has held that "equitable relief" in the Employee Retirement Income Security Act of 1974 encompasses only relief that was traditionally available in equity. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (quotation marks omitted); *see also Great-West Life & Annuity Co. v. Knudson*, 534 U.S. 204, 209–13 (2002) (same). The Court has done the same for § 524(a)(2) of the Bankruptcy Code, holding that its language empowering bankruptcy courts to issue orders that "operate[] as an injunction" carried with it the traditional contempt power. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting 11 U.S.C. § 524(a)(2)). Even more recently, the Court held that Congress's authorization "to enjoin any ... act or practice" that violated the Federal Trade Commission Act did not permit courts to order disgorgement because disgorgement was not a traditional remedy in equity. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348–50 (2021) (quoting 15 U.S.C. § 53(b)); *see also De Beers Consol. Mines v. United States*, 325 U.S. 212, 218–19 (1945) (rejecting government's request for injunction under Sherman Act's provision for orders "to prevent and restrain violations of this act" because it was not consistent with "the

general principles which govern the granting of equitable relief" as "traditionally exercised by courts of equity").

In each of the above cases, the Court treated Congress's failure to expressly displace traditional constraints on the equity power as an incorporation of those constraints. Here, the Rules Enabling Act makes clear that the Supreme Court was *not* authorized to displace those traditional constraints. And in any event, nothing about the unadorned reference to "injunctive relief" in Rule 23(b)(2) remotely suggests a departure from historical practice. *Cf. United States v. Szoka*, 260 F.3d 516, 523-24 (6th Cir. 2001) (holding that the Communications Act's directive that "the court shall enforce obedience to such order by a writ of injunction," 47 U.S.C. § 401(b), displaced traditional equitable discretion; "Congress has replaced the traditional equitable factors with a different inquiry").

The Advisory Committee Notes also provide no indication that Rule 23(b)(2) was intended to displace traditional constraints. The Notes identify "[i]llustrative" examples of the cases contemplated under Rule 23(b)(2), including principally segregation cases involving schools and places of public accommodation—"conduct that was remedied by a single

classwide order," *Wal-Mart*, 564 U.S. at 361. Fed. R. Civ. P. 23(b)(2) Advisory Comm.'s Note to 1966 Amendment. Even the Notes' reference to price-discrimination cases is explicitly tied to the proviso that the action must be one "looking to specific or declaratory relief"—forms of relief that were traditionally available in equity. *Id*. Nothing in the Notes suggests that Rule 23(b)(2) was intended to allow litigants like Hardwick to seek relief that is fundamentally monetary in nature in the guise of novel "injunctive" relief.[2]

Rule 23(b)(2) does not give district courts authority to fashion novel remedies in the name of equity that were not available under traditional equity practice at the time of the Founding. Accordingly, as explained below, the district court's order here cannot survive unless the remedies that it permits Hardwick's class to pursue both (1) comport with traditional equitable principles, and (2) have a historical analogue in Founding-era practice. As the next section explains, neither is true.

---

[2] In any event, as the Court observed in *Wal-Mart*, even if snippets of the Notes could be read differently, "[o]f course it is the Rule itself, not the Advisory Committee's description of it, that governs." 564 U.S. at 363.

## II. The relief sought by Hardwick does not comport with traditional equitable principles and has no historical analogue.

To determine whether a remedy sought in the name of equity is cognizable, courts generally require that the remedy satisfy two criteria. First, the remedy must comport with the general principles that governed traditional equity practice. Second, the remedy must have a historical analogue in the specific remedies that equity courts employed at the time of the Founding. *See De Beers*, 325 U.S. at 219 (holding that courts should "inquir[e] as to what is the usage and what are the principles of equity applicable in such a case"); *Zacharie*, 31 U.S. at 654 ("the modes of proceeding in equity suits shall be according to the *principles, rules and usages* which belong to courts of equity" (emphasis added)); *Russell v. Southard*, 53 U.S. 139, 144, 155–56 (1851) (pointing to the lack of historical analogues for using a trust in the way sought by litigant); *United States v. Bitter Root Dev. Co.*, 200 U.S. 451, 477 (1906) (relying on the principle that monetary relief was available at law and noting the lack of a traditional trust); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 476–77 (1962) (relying on the principle that a legal remedy precludes

equitable relief and rejecting plaintiff's non-traditional bill of accounting).

Here, Hardwick made "no argument … that an 'injunction' ordering a transfer of money to create a science panel (to discern liability) and to fund medical monitoring was a remedy somehow 'traditionally accorded by courts of equity.'" *In re 3M Co.*, 2022 WL 4149090, at *5 n.3 (quoting *Grupo Mexicano*, 527 U.S. at 319). In fact, Hardwick agreed that "it would have been unheard of for an English Chancery Court hundreds of years ago to commission a science panel to make determinations about the effects of PFAS blood contamination." MTD Opp., R.94, PageID#530. As explained in part A, the remedies that Hardwick seeks—and that the district court allowed his class to seek under Rule 23(b)(2)—fail to comply with foundational principles governing equity. And as discussed in part B, those remedies also lack any historical analogue among the bills that were available in equity at the Founding. This analysis confirms that the remedies sought by Hardwick's class are not cognizable under Rule 23(b)(2).

### A. Hardwick's remedies violate core principles governing equity at the time of the Founding.

Hardwick's proposed remedies run afoul of the core principles that characterized equity practice at the Founding. To begin, an elementary principle of equitable jurisdiction is that the existence of an adequate legal remedy for the type of claim asserted by the plaintiff precludes resort to equity. 1 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 178 (4th ed. 1918); *Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 827 (D.N.J. 1830) (holding an injunction inappropriate where money damages would suffice). And a plaintiff's inability to meet the requirements to bring a meritorious claim at law does not make the legal remedy inadequate; it just means that his claim lacks merit. *See Bitter Root Dev. Co.*, 200 U.S. at 451–52, 456, 461, 472 ("[t]he principal ground upon which it is claimed that the remedy at law is inadequate is really nothing more than a difficulty in proving the case against the defendants"); *Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 69–70 (1935) (explaining that a law "which deprives a federal court of its authority to act at law is not ground for invoking its equity powers. The statute forbids resort to equity in the federal courts when they afford

adequate legal relief. It does not purport to command that equitable relief shall be given in every case in which they fail to do so.").

Adequate legal remedies preclude equitable claims even when plaintiffs dress their damages claims in equity's clothing. *Dairy Queen*, 369 U.S. at 477 ("we think it plain that their [equitable] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed"). And "[a]lmost invariably, … suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for money damages." *Knudson*, 534 U.S. at 210 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 918–19 (1988) (Scalia, J., dissenting)).

Another bedrock principle of traditional equity was the distinction between mandatory and preventative injunctions. Preventative injunctions were the norm. They were "not used for the purpose of punishment or to compel persons to do right, but simply to prevent them from doing wrong." Francis Hilliard, The Law of Injunctions § 5 (2d ed. 1869) (describing the preventative nature of injunctions as a "leading principle" of equity).

Mandatory injunctions, *i.e.*, a command to perform some affirmative act, were only granted in the rarest of occasions, usually involving property rights. *See id*; 1 Pomeroy, Equity Jurisprudence, at §§ 38, 170; *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972) ("usage and practice suggest that [mandatory injunctions] be employed only in the most unusual case … [and] the applicants' right to relief must be indisputably clear"); *see also In re Sawyer*, 124 U.S. 200, 213–14 (1888) ("[i]t is elementary law that the subject-matter of the jurisdiction of a court of chancery is civil property" (quotation marks omitted)). Relatedly, an injunction should be "clear and explicit, and apprise the defendant what he is restrained from doing." Hilliard, The Law of Injunctions, at § 87; *Ripon v. Hobart*, 40 Eng. Rep. 65, 67 (Ch. 1834) (refusing to issue an injunction that left the defendant "to discover what was forbidden and what allowed").

Courts also traditionally declined equitable jurisdiction where the questions were new and too broad, deep, or difficult to be measured by existing modes of equitable relief. Charles Fisk Beach Jr., I Modern Equity: Commentaries on the Law of Injunctions § 48 (1895); *see, e.g., Dering v. Earl of Winchelsea*, 29 Eng. Rep. 1184, 1186 (Ch. 1787)

(rejecting equitable jurisdiction because "the equity he asks [is] doubtful" and novel); *Jackson v. Petrie*, 32 Eng. Rep. 807, 807 (1804) (refusing to enjoin defendant from leaving the court's jurisdiction due to the novel nature of the claim).

Hardwick's remedies fail all these principles. As an initial matter, Hardwick's sought-after relief is a Trojan horse for damages: it "purports to be an 'injunction,' [bu]t would have the practical effect of extracting billions of dollars from defendants." *In re 3M Co.*, 2022 WL 4149090, at *9 (footnote omitted). Indeed, this Court, alongside numerous other circuits, has recognized that medical monitoring relief is only "quasi-equitable" at best. *See Olden v. LaFarge Corp.*, 383 F.3d 495, 510 & n.7 (6th Cir. 2004) (collecting cases casting doubt on the equitable nature of medical monitoring remedies). And many courts have found medical monitoring to be only "an element of damages." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001).

The district court did not even try to frame the proposed injunction in prohibitory terms, a tactic that courts have used in the past to clothe mandatory injunctions in prohibitory garb. *See Lane v. Newdigate*, 32 Eng. Rep. 818, 819 (Ch. 1804). Rather, the remedy would compel

Defendants to affirmatively "do right" through a study and medical monitoring, without stopping Defendants from doing anything.

Apart from its mandatory nature, the extraordinary scope and novelty of Hardwick's proposed "injunction" show that it raises—at the least—broad, deep, and difficult questions. For one thing, the certified class dwarfs what the Supreme Court described as "one of the most expansive" classes in history. *In re 3M Co.*, 2022 WL 4149090, at \*9 (quoting *Wal-Mart*, 564 U.S. at 342).[3]

For another, the district court usurped the role of Congress and the Executive Branch, which are far better equipped—and constitutionally responsible—for addressing issues of nationwide scope at the frontiers of scientific knowledge. The Environmental Protection Agency, for example, is studying, and taking (or considering taking) various actions to regulate, different PFAS substances, subject to judicial review under such statutes as the Administrative Procedure Act (APA). The ad hoc "science panel" sought by Hardwick would lack both EPA's institutional expertise and its political accountability and would be unmoored from

---

[3] And as if a class of all 11 million Ohioans were not extraordinary enough, Hardwick has already indicated his desire to expand the class to residents of many other states, if not nationwide. *Id.*

customary APA and other legal constraints.[4] Put simply, it is not the role of the Judicial Branch to force companies to pay to create ersatz regulatory agencies with a mission "to tell [would-be plaintiffs] if [they are] at risk of developing a disease." *In re 3M Co.,* 2022 WL 4149090, at *6. The frontier of scientific understanding is no place for innovation in equity practice that would displace the established roles of agency regulators and Congress.

## B.   Hardwick's remedies have no historical analogue.

Given how radically Hardwick's proposed remedies depart from the traditional equity principles discussed in the previous section, it is no surprise that they also lack any historical analogue. Because Rule 23(b)(2) authorizes "appropriate" "injunctive relief"—rather than any form of equitable relief more broadly—the only relevant historical analogue is injunctive relief. The injunctive relief traditionally available in equity does not remotely encompass the relief Hardwick seeks. And while other traditional bills available in equity at the Founding cannot

---

[4] *See* EPA, No. EPA-100-K-21-002, PFAS Strategic Roadmap: EPA's Commitments to Action 2021–2024 (2021), https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf; *EPA's Actions to Address PFAS*, EPA.gov (2022), https://www.epa.gov/pfas/epa-actions-address-pfas.

help Hardwick given Rule 23(b)(2)'s limitation to "injunctive relief," the contours of these bills further confirm that there is no historical analogue for the relief he seeks.

1. While the writ of injunction was traditionally available in equity at the Founding, that remedy was limited and would not have issued in anything like the circumstances of this case. Traditional injunctions generally issued to prevent harm to real or personal property, protect notes or other fiscal instruments, restrict waste by trustees, enforce fiduciary duties, and protect copyrights and patents. Story, Commentaries, at § 872. The unifying theme is that courts used injunctions to protect property rights. Courts did not have equitable jurisdiction over most torts. *See Am. Malting Co. v. Keitel*, 209 F. 351, 353–54 (2d Cir. 1913) (finding that, traditionally, equitable courts had no jurisdiction to hear libel and tortious interference cases). And it was especially clear that equitable jurisdiction did not extend to torts to another's person. 4 Pomeroy, Equity Jurisprudence, at § 1347 ("The legal remedy is ordinarily considered as adequate in cases of torts to the person … and equity does not interfere."). While injunctions were sometimes available to "suppress the continuance of public or private nuisances,"

such an injunction required a showing of irreparable harm, clear title to the remedy, and no substantial doubt or question about the remedy. 2 Pomeroy, Equity Jurisprudence, at § 872. And courts considering such injunctions were required to proceed with "greater caution, deliberation, and sound discretion" because injunctions are "dangerous in a doubtful case." *Bonaparte*, 3 F. Cas. at 827.

Hardwick's claim bears no resemblance to a traditional, property-focused claim for injunctive relief. His claim is that a tort may have been done to his person—not his property. And traditional injunctions in nuisance cases did not provide anything like the remedy he seeks. One leading treatise used 116 cases to illustrate the scope of courts' injunctive power over public and private nuisances, and the court in every one of them awarded a single remedy: enjoining the harmful conduct at issue. 4 Pomeroy, Equity Jurisprudence, at § 1349 nn.1–2, § 1350 n.1. While the facts of these cases differ, the remedy did not. That is because the very foundation of a court's injunctive power was to prevent imminent or continuing harm. *See Osborn v. Bank of United States*, 22 U.S. 738, 747, 842 (1824). Hardwick's desired remedy would not prevent or stop the harm he alleges. Instead, it would force Defendants to pay to generate

scientific evidence to help Hardwick figure out whether he has suffered any harm in the first place—and therefore whether he has a claim for damages. A more thorough disconnect with traditional equity practice would be hard to imagine.

2. Even if Rule 23(b)(2) authorized class actions seeking equitable remedies more broadly, as opposed to "injunctive relief" specifically, Fed. R. Civ. P. 23(b)(2), Hardwick's requested relief would find no analogue.

Bills of discovery and bills of accounting were available at the Founding as remedies that were distinct from injunctions. Bills of discovery permitted plaintiffs to seek evidence the lack of which impeded their legal claims. Rupert F. Barron, Annotation, *Existence and Nature of Cause of Action for Equitable Bill of Discovery*, 37 A.L.R. 5th 645 § 2 (1996). And bills of accounting allowed plaintiffs to compel the production of evidence showing the amount of their harm or damages if there was liability but if the amount of harm was unclear. *See* 1 Pomeroy, Equity Jurisprudence, at § 112. Neither bill is an analogue for the relief Hardwick seeks.

First, he is not invoking equity to obtain evidence that already exists so that he can quantify a known, present injury—he is trying to

25

enlist the court, and Defendants' funds, to *generate* new evidence that may, years down the road, shed light on *whether* he has any injury in the first place. Bills of discovery and accounting cannot be used to create evidence. Story, Commentaries, at § 1483; 1 Pomeroy, Equity Jurisprudence, at §§ 449–51.

Second, bills of discovery have never been allowed in aid of tort claims—much less a tort claim as speculative and circular as Hardwick's. *In re Japanese Elec. Prods. Antitrust Litig.*, 631 F.2d 1069, 1080 (3d Cir. 1980) ("We are aware of no case, however, in which a chancellor ordered an accounting in a suit involving nothing more than liability for money damages in trespass or tort."); *Robinson v. Craig*, 16 Ala. 50, 51 (1849) (finding no precedent for use of bill of discovery in aid of tort claims and stating that "a plaintiff who has sued for a tort done to his person, cannot file a bill of discovery to compel the defendant to confess the commission of the tort").

Third, requests for "accounting" in tort claims are generally considered mere damages claims. "[A] broad general rule [] may be laid down that equity will not decree an accounting in furtherance of a claim based on a tort." R.E. La G., Annotation, *Accounting in Equity in Case of*

*Tort*, 53 A.L.R. 815 (1928). Indeed, the Supreme Court has rejected damages claims disguised as requests for accounting, like Hardwick's. *See Bitter Root Dev. Co.*, 200 U.S. at 451–52, 456, 461.

Accordingly, Hardwick's claimed relief doubly fails the historical analogue test: it would not have qualified for these equitable bills, and it certainly would not have qualified as "injunctive relief."

*    *    *

While equity offers some flexibility, it is not "without limit and control; on the contrary, it is regulated by rules of pleading and procedure." 1 Pomeroy, Equity Jurisprudence, at § 115. As stated by the Supreme Court, "in the federal system" equity's "flexibility is confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano*, 527 U.S. at 322. Hardwick's requested relief bears no resemblance to the traditional injunctions that were available at the Founding. As a result, his claims are not cognizable under Rule 23(b)(2). The district court ventured far outside the constraints of traditional equity practice to indulge Hardwick's novel and sweeping claims. For that and the other reasons discussed by Defendants, this Court should reverse the class certification order.

## CONCLUSION

The Court should reverse the class certification order.

Respectfully submitted,

*/s/Jeffrey S. Bucholtz*

Andrew R. Varcoe
Jennifer B. Dickey
U.S. CHAMBER
LITIGATION CENTER
1615 H Street NW
Washington, DC 20062

*Counsel for the Chamber of Commerce of the United States of America*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for the Chamber of Commerce of the United States of America, American Tort Reform Association, and National Association of Manufacturers*

H. Sherman Joyce
Lauren Sheets Jarrell
AMERICAN TORT
REFORM ASSOCIATION
1101 Connecticut Avenue NW
Suite 400
Washington, DC 20036

*Counsel for American Tort
Reform Association*

Erica Klenicki
Michael A. Tilghman II
NAM LEGAL CENTER
733 Tenth Street NW
Suite 700
Washington, DC 20001

*Counsel for National
Association of Manufacturers*

Aleacia Chinkhota
AMERICAN
CHEMISTRY COUNCIL
700 Second Street NE
Suite 700
Washington, DC 20002

*Counsel for
American Chemistry Council*

Val Leppert
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309

Barrett Anderson
KING & SPALDING LLP
1100 Louisiana Street
Houston, TX 77002

*Counsel for the Chamber of
Commerce of the United States of
America, American Tort Reform
Association, and National
Association of Manufacturers*

December 27, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5). This brief contains 5,378 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Date: December 27, 2022.

*/s/ Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2022, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz